IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of | No.  50438-3-II |
| E.J.S., JR., | |
| Respondent. | UNPUBLISHED OPINION |

JOHANSON, P.J.  —  EJS, Jr. challenges his May 11, 2017 180-day civil commitment to Western State Hospital (WSH).[1]  He argues that the evidence was insufficient to establish that he was gravely disabled.  We affirm.

FACTS

I. BACKGROUND

EJS has a long history of mental health issues and has been hospitalized for mental health treatment numerous times since 1989.  In 2015, EJS was released from WSH and placed in a supportive housing program.  But he "eloped" from that facility sometime in May 2015.  Clerk's Papers (CP) at 11.

---

[1] Although this commitment has expired, this issue is not moot.  *In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012).

Two months later, he "was found by the police in the streets acting bizarrely." CP at 78. This bizarre behavior included "throwing potato chips on the ground, putting them back in the bag, and then eating them." CP at 77. He was also observed attempting "to put a dollar bill into his eye," and, later, attempting "to push the end of his belt into his eye." CP at 77-78. The police transported EJS to Harborview Medical Center's emergency department, where he was admitted into the inpatient psychiatric unit.

In August, the King County Superior Court found him gravely disabled and ordered a 90-day commitment, and EJS was admitted to WSH. EJS's treatment providers at WSH successfully petitioned in the Pierce County Superior Court for several additional 180-day commitments.

## II. APRIL 2017 PETITION

In April 2017, EJS's treatment providers petitioned for an additional 180-day commitment. Dr. Angel Lugo-Steidel testified at the commitment hearing.

EJS had been a resident in Dr. Lugo-Steidel's ward since March 9, 2017. Dr. Lugo-Steidel testified that EJS had been diagnosed with schizoaffective disorder bipolar type and that EJS was still having psychotic symptoms.

Dr. Lugo-Steidel stated that EJS's primary psychotic symptom was "a fixed persecutory delusion that the Hospital, the County, and every government agency does not have his correct personal information." Verbatim Transcript of Proceedings (VTP) at 5. Thus, EJS believed that his involuntary commitments and his confinement were based on incorrect identification. This delusion, which persisted despite medication, sometimes resulted in EJS believing that he did not "need to take medication." VTP at 7.

EJS also believed that he was a professional baseball player and that he owned property in Seattle. Dr. Lugo-Steidel testified that these delusions prevented EJS "from discussing a realistic treatment plan" because he could not realistically discuss where he would live when he was discharged. VTP at 8.

Dr. Lugo-Stiedel further testified that although EJS was currently able to "attend to his activities of daily living," EJS had been "extremely irritable and sometimes angry." VTP at 6, 11. The doctor opined that this anger was caused by EJS's delusion that the hospital had misidentified him. EJS's treatment team had reported that EJS had been becoming increasingly angry over the past two weeks. His increased anger and his agitation made it "difficult to assess whether [EJS was] communicating needs." VTP at 11. On the day of the hearing, EJS had been so loud and angry during a "team meeting" that they "had to go outside and sort of address it with him." VTP at 6.

Dr. Lugo-Steidel admitted that EJS was currently compliant with his medications and agreed that EJS's delusional state "may remain present with him" if he was moved towards release into the community. VTP at 6. But the doctor expressed concern about EJS's ability to progress in his treatment if he were to be discharged. The doctor opined that EJS would stop taking his medication and would decompensate if released from a structured environment. The doctor noted that "it seems that every time [EJS] comes back in, he's highly psychotic and engaging in very dangerous behavior such as the last time he was here when he was trying to hurt himself." VTP at 7.

3

Dr. Lugo-Steidel further testified that because release was unrealistic at that time, the next step in EJS's treatment plan would be a medication change. Because of EJS's advanced age,[2] any change in medication had to be done carefully due to the increased risk of side effects.

As to EJS's history, Dr. Lugo-Steidel testified that EJS had been admitted to WSH 20 times. Although EJS had been released into less restrictive alternatives (LRAs) "seven times" in the past, he had "a history of decompensating upon discharge," likely because of medication compliance issues. VTP at 7.

On cross-examination, EJS's counsel asked Dr. Lugo-Steidel why EJS had not been discharged from WSH when "at the time of his last petition the Court did find that he was ready for [an LRA] and that was contingent on him engaging in realistic discharge planning." VTP at 11-12. The doctor testified that release to an LRA had been contingent on EJS's engaging in realistic discharge planning and that EJS's delusions had prevented him from complying with this requirement. Dr. Lugo-Steidel stated, "[EJS has] told me that since we don't have his right information, that any type of [LRA] does not apply to him, it applies to somebody else." VTP at 12.

Throughout Dr. Lugo-Steidel's testimony, EJS attempted to object. He continuously informed his counsel and the superior court that he had been misidentified and that the records showing that he had prior commitments were another person's records.

When EJS testified, he insisted that his last name was in fact one of his middle names and that his last name was actually "Junior." VTP at 13. He presented a voter registration card with

---

[2] EJS was 71 years old at the time of the hearing.

the name EJS Junior on it to prove that that was his real name. He also appeared to believe that

he had been committed on the basis of a criminal charge and that this proceeding was faulty. He

testified that he believed he should be able to leave WSH because he had completed the time for

the misidentified person. He also appeared to believe that he, an African-American man, had also

been a Caucasian at some point. When asked where he would live if discharged, he asserted that

he had "a position with the military." VTP at 16. He also believed that the commitment proceeding

should have occurred in King County, apparently because he believed that he was registered to

vote there and that he was not represented by counsel.

After hearing the testimony, the trial court entered the following factual statement:

> The Court was advised of [EJS's] prior hospitalizations and detentions as follows: <u>Per Testimony of Petitioner and Declaration in Support of Petition: 20th admit to WSH, including 7 prior LRA's [sic].</u>
> [EJS's] current mental status examination reveals: Medication rights given and wishes respected. Symptoms: still has psychotic symptoms with a fixed persecutory delusion that all government agencies do not have his correct information (date of birth, name, etc.) and therefore believes that he is unjustly detained. Other symptom is that he is extremely irritable and angry with Petitioner. Most of [the] anger is around not having correct information. Very persistent delusion and does not believe it no matter what even if shown what WSH has by way of information. He says that he is not supposed to be civilly committed and is not happy he needs to be here and will not take medications. Has long history of going off his medications. During hearing he says "I object" and when I tell him he cannot object since he is not an attorney he says he is an attorney as well. His delusions prevent him from engaging in a realistic discharge plan: says he is a baseball player for the Mariners, etc. He wants to be known as "Junior" and not "Mr. [S]." He is very intrusive even with his own attorney. He wants to direct her questioning about his name and identity. He does attend to his own [activities of daily living] and can communicate his anger but questionable about communication of his needs. Had previously been on discharge list but is unable to discuss meaningful discharge plan.
> Further, based on the petition and testimony of Petitioner, [EJS]: He provides his Voter Registration card which has his name as [EJS] Junior so he says that is the truthful name. He says that prior orders did not have a charge that he was to be found guilty of. Lots of complaints about the underlying actions not raising duress, perjury, etc. He says he has a position with the military when asked where he would

> live.  He is an African American man who says he has also been a Caucasian man.
> Complains that [Department of Assigned Counsel] attorney Sara Tofflemire did not
> get him a change of venue.

CP at 86.

Based on these facts, the trial court found that EJS continued to be gravely disabled, stating that "as a result of a mental disorder[, EJS] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, is not receiving such care as is essential for health and safety."  CP at 85-86.  The trial court also found that LRA treatment was not in EJS's best interest.  On May 11, 2017, the trial court granted the petition and ordered 180 days of intensive inpatient treatment.

EJS appeals the May 11, 2017 order.

ANALYSIS

EJS argues that the trial court's finding that he is gravely disabled is not supported by substantial evidence.  We disagree.

I. STANDARD OF REVIEW

We review a trial court's finding that an individual is gravely disabled, as defined in former RCW 71.05.020(17) (2011), to determine if the finding is supported by "substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing."  *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986); *see also In re Det. of M.K.*, 168 Wn. App. 621, 629-30, 279 P.3d 897 (2012).  When the State must prove its case by clear, cogent, and convincing evidence, the ultimate fact in issue must be shown by evidence to be "'highly probable.'"  *LaBelle*, 107 Wn.2d at 209 (quoting *Pawling v. Goodwin*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).

6

## II. SUBSTANTIAL EVIDENCE

The trial court found that EJS was gravely disabled "as a result of a mental disorder"[3] under former RCW 71.05.020(17)(b). Under former RCW 71.05.020(17)(b), the petitioner must

> provide a factual basis for concluding that an individual "manifests severe [mental] deterioration in routine functioning." Such evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.
> Furthermore, the mere fact that an individual is mentally ill does not also mean that the person so affected is incapable of making a rational choice with respect to his or her need for treatment. Implicit in the definition of gravely disabled under [former] RCW 71.05.020(1[7])(b) is a requirement that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment. This requirement is necessary to ensure that a causal nexus exists between proof of "severe deterioration in routine functioning" and proof that the person so affected "is not receiving such care as is essential for his or her health or safety."

*LaBelle*, 107 Wn.2d at 208 (some alteration in original).

EJS argues that (1) "[t]here was no showing of any repeated or escalating loss of cognitive or volitional control," and (2) "[t]he State did not show that only involuntary commitment will ensure E.J.S.'s health and safety." Opening Br. of Appellant at 5-6. We disagree.

The record shows that as of July 2015, approximately two months after leaving a controlled environment, EJS's behavior had deteriorated to the point that he was acting bizarrely and

---

[3] EJS does not challenge the trial court's finding that he suffers from a "mental disorder."

attempting to harm himself. Additionally, Dr. Lugo-Steidel testified that although EJS was currently able to "attend to his activities of daily living," EJS had been "extremely irritable and sometimes angry" and that EJS had become increasingly angry during the two weeks preceding the May 11, 2017 hearing. VTP at 6, 11. The doctor opined that EJS's anger was caused by his delusions and that EJS's delusions prevented him from understanding his need for medication, participating in developing a reasonable release plan, or understanding the need for ongoing treatment. Thus, substantial evidence supports a finding that there was a repeated and recently escalated loss of cognitive control.

This same evidence, coupled with EJS's long history of mental health issues, also establishes that only involuntary commitment would ensure EJS's health and safety. Dr. Lugo-Steidel's testimony, considered in context with EJS's history, provides substantial evidence to support the trial court's finding that an LRA would not be appropriate. Dr. Lugo-Steidel testified that EJS's delusions impaired his ability to plan a functional release plan or to understand that he needed to remain compliant with his medications. And EJS's long history of failed LRAs and involuntary commitments, coupled with the doctor's testimony that this was attributable, at least in part, to EJS's inability to remain compliant with his medications due to his delusions, support the conclusion that an LRA would not be in EJS's best interest at this time.

No. 50438-3-II

Because substantial evidence supports the trial court's gravely disabled finding, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, P.J.

We concur:

BJORGEN, J.

SUTTON, J.